40

GOLDMAN, EXECUTRIX, APPELLEE, *v.* JOHNS-MANVILLE SALES CORP. ET AL.;
OWENS-ILLINOIS, INC. ET AL., APPELLANTS.

[Cite as Goldman *v.* Johns-Manville Sales Corp. (1987), 33 Ohio St. 3d 40.]

(No. 86-1470—Decided October 14, 1987.)

*Gallon, Kalniz & Iorio Co., L.P.A.,* and *David W. Zoll,* for appellee.

*Fuller & Henry* and *Robert A. Bunda,* for appellants Owens-Illinois, Inc. et al.

*Frutig, Polito & Travis Co., L.P.A.,* and *Thomas R. Frutig,* for appellants Keene Corp. et al.

*Hesser, Armstrong & Disantis,* and *Richard J. Disantis,* for appellant Raymark Industries, Inc.

*Arter & Hadden, John D. Maddox,* and *Irene C. Keyse-Walker,* for appellant Combustion Engineering, Inc.

*Vorys, Sater, Seymour & Pease* and *Russell P. Herrold, Jr.,* urging reversal for *amicus curiae,* Ohio Manufacturers' Assn.

WOLFF, J. In this case we are asked to decide whether the theory of alternative liability, as recognized by this court in *Minnich* v. *Ashland Oil Co.* (1984), 15 Ohio St. 3d 396, 15 OBR 511, 473 N.E. 2d 1199, is applicable to the facts of this case. If it is not, we then must decide whether we should recognize as a theory of recovery in this case the market-share theory of liability, as first espoused in *Sindell* v. *Abbott Laboratories* (1980), 26 Cal. 3d 588, 163 Cal. Rptr. 132, 607 P. 2d 924, certiorari denied *sub nom. E.R. Squibb & Sons* v. *Sindell* (1980), 449 U.S. 912. The Court of Appeals for Lucas County in the instant cause held that the

market-share theory would be recognized, and that both theories were applicable to this case. We reverse the court of appeals for the reasons that follow.[3]

At the outset, it is important to understand that both alternative liability and market-share liability are exceptions to the general rule that a plaintiff has to prove an injury was caused by the negligence of a particular defendant. Both theories are judicially created, and shift the burden of proof to each defendant to show that the plaintiff was not injured by that defendant's negligence. Put another way, both theories merely relax the requirement that the plaintiff identify which one of a group of negligent tortfeasors caused the injury to the plaintiff. In the context of asbestos litigation, the plaintiff has the burden of proving exposure to asbestos-containing products. A defendant is not liable under either theory if the evidence fails to establish that Roy Goldman was exposed to the type of product it produced.

In this case, the trial court specifically found that Goldman was unable to identify *either* the products *or* the manufacturers of those products. The appellate court, however, characterized the issue in terms of the plaintiff's only being unable to identify the manufacturers of the products allegedly present at the bakery.

We have, therefore, reviewed the sufficiency of the affidavits and depositions introduced by the plaintiff in opposing the motions for summary judgment, in order to decide whether reasonable minds could differ on the question of what products were present at the Sherlock Bakery. Our review of the record convinces us that the evidence presented to the trial court was not sufficient, as a matter of law, to create an issue of material fact as to any product allegedly present at Sherlock, save one—asbestos tape.

The evidence introduced by the plaintiff consisted of various affidavits of experts, a doctor, and an individual who performed certain construction activities at the bakery. Also introduced was the deposition of Walter Rollman, a former maintenance man at Sherlock Bakery. There was also an affidavit by Rollman. We will address these items separately.

The affidavit of Steve Szeman avers that he had on numerous occasions entered the Sherlock Bakery in 1961, and was employed at another bakery as a plant engineer. The affidavit further states that he observed steam pipes wrapped in insulation, and white panels nailed to the ceiling. Szeman further averred that: "From my experience in the bakery industry, I *believe* that these items contained asbestos for heat and fire protection. * * * That I observed that [*sic*] I *believe* was rockwool insulation between mesh walls in the ovens. The mesh walls appeared to be sealed with a plaster-like material. From my knowledge and experience in the bakery industry at that time, I *believe* that the plaster-like material contained asbestos." (Emphasis added.)

It is obvious that this affidavit does not comply with Civ. R. 56(E) which states that affidavits supporting or opposing motions for summary judgment

---

[3] The court of appeals ruled that both alternative liability and market-share liability applied to this case. In essence, the court held that market share was a means of apportioning damages after liability was established pursuant to alternative liability theory. As we will discuss, *infra,* the court of appeals erred in applying both theories; market-share liability applies, if at all, only if alternative liability does not apply.

must be made on personal knowledge, setting forth facts which would be admissible into evidence. Szeman's lack of personal knowledge as to the existence of asbestos at the Sherlock Bakery is also shown in his deposition, which was filed by the defendants on March 6, 1984:

"Q. * * * From your own personal knowledge, do you know whether or not there was any asbestos-containing products within the Sherlock Bakery?

"MR. YOUNG: Objection.

"A. No."

All the plaintiff's supporting affidavits suffer from the same lack of personal knowledge. Richard Lemen, an asbestos expert, was able to state only:

"That an employee of a bakery would, *upon reasonable probability,* be exposed to asbestos dust and fibers *if* asbestos pipe insulation, asbestos ceiling boards, and asbestos oven gaskets and cement were used in the bakery and ovens." (Emphasis added.)

Robert Bellner, who performed some remodeling on the bakery, was only able to state that he "believed" that four by eight foot boards he placed on the ceiling were made of asbestos.

The plaintiff also submitted the affidavit of Roy Steinfurth, who had extensive experience with asbestos and asbestos-related health risks in his capacity as a member of the OSHA Advisory Committee for the building and construction industry. This affidavit, dated February 14, 1984, states as follows:

"2. That, *upon reasonable probability,* asbestos dust and microscopic fibers would exist in the atmosphere of a bakery if asbestos pipe insulation, asbestos ceiling boards, and asbestos oven gaskets and cement were used, bumped, installed, removed, replaced, damaged, or otherwise became worn.

"3. That heat or high temperatures causes greater deterioration of asbestos products such as asbestos boards, pipe insulation, asbestos oven gaskets and seals, which would *create a greater probability* that microscopic asbestos fibers, those which are inhalable, would exist in the atmosphere.

"4. That workers in such an environment as the bakery in which Roy Goldman was working would be exposed to asbestos." (Emphasis added.)

This affidavit is also insufficient under Civ. R. 56, as the affiant does not testify from personal knowledge. In addition, defendant GAF Corp. also attached an affidavit by Steinfurth to its motion for summary judgment. This affidavit is dated January 27, 1984, and states:

"3. He never worked at the Sherlock Bakery in Toledo, Ohio during his years in the insulation field.

"4. He has no knowledge of any asbestos-containing products at the Sherlock Bakery in Toledo, Ohio.

"5. To his knowledge, he has never met Roy Goldman.

"6. He has no knowledge of Roy Goldman ever being exposed to any asbestos-containing products of any manufacturer."

Walter Rollman was a maintenance man at the Sherlock Bakery from about 1952 until the bakery closed in the early sixties. In his deposition, Rollman indicates only that he was "told" that the insulating board above the ovens "probably was asbestos." He also was unable to definitively say whether the pipe insulation contained asbestos:

"Q. Well, how were all the steam pipes insulated?

"A. Well, the same covering. I would say it was asbestos. I wouldn't swear. I'm not an engineer or nothing, but that's what they always told me it was asbestos insulation."

Taken as a whole, Rollman's deposition shows that he did not know whether any product in the bakery contained asbestos, except the tape that was used to seal the joints inside one of the ovens. Rollman was also unable to remember any of the contractors that did insulation work at the bakery, or whether the insulation contained asbestos.

As to the tape, however, Rollman was able to identify the asbestos tape as coming from a Toledo distributor, Sussman Asbestos Co.[4] Rollman also said that he never worked with Roy Goldman, and that he had no knowledge as to whether Goldman was ever exposed to asbestos. Rollman also admitted that his affidavit, dated two years before the deposition, averred that Goldman had been "exposed" to asbestos only because Goldman had worked at the bakery:

"Q. Mr. Rollman, if you would look at * * * Defendant's Exhibit A. I just want to ask you about the last paragraph there. It's stated in your affidavit you were a friend of and co-worker of Roy Goldman and can attest to his job as a swingman which would have exposed him to the asbestos insulation used on the steam pipes running to the ovens and washers as well as to the asbestos board located above the large ovens. That's your statement, correct?

"A. Yes.

"Q. And I take it from that statement, correct me if I am wrong, I want to be fair to you, that simply because you're making this statement on the basis that Roy Goldman worked at the bakery, correct?

"A. Yeah."

Later in the deposition, Rollman was asked:

"Q. Just so I understand it, the only product that you can specifically recall to your own personal knowledge that had asbestos in it was the tape that was bought and installed in some of the ovens, is that correct?

"A. Yes."

On the question of what asbestos-containing products were present at the bakery, the state of the evidence before the trial court was that there was asbestos tape in at least one oven, and that the tape was supplied by the Sussman Asbestos Co. Therefore, any defendant that could show either (1) that it did not produce tape, or (2) that it did not do business with Sussman Asbestos, should have been granted summary judgment on the basis that it could not have been the cause of Goldman's injury. There was sufficient, unrebutted evidence before the trial court to show that some of the defendants could not have caused the injury. This evidence is contained in the answers to plaintiff's first and second sets of interrogatories.

The answers to the first set of interrogatories, filed by Johns-Manville before the bankruptcy stay was granted, show that Manville did produce tape, and that Sussman was a Manville distributor. There is no evidence on the record, however, that Sussman did not distribute tape produced by any other company. The second set of interrogatories specifically asked about Sussman, as well as the oven tape. While most of the defendants did not have records concerning their distributors during the relevant time period, i.e., the 1950s, most were able to answer concerning the tape. On the basis of these answers, it is clear that the following defendants could not have produced the tape: Owens-Illinois, Combustion Engineering,[5]

---

[4] Sussman Asbestos Co. is not named as a party to this suit.

[5] This defendant also sought summary judgment on the grounds that it did not

Forty-Eight Insulations (now in bankruptcy), Fibreboard Corp., Eagle-Picher Industries, and Standard Asbestos Manufacturing (which did not do business with Sussman and is also bankrupt).

Owens-Corning Fiberglas Corp. indicated that the only product it ever supplied to Sussman was metal-mesh blankets. As to these defendants, reasonable minds could not differ as to whether their products caused Goldman's death. Summary judgment was proper as to these defendants solely because there is no dispute as to any material fact.

As to the remaining defendants, we must now turn to the legal issues in this case; namely, whether alternative liability or market-share liability are viable theories of recovery. We conclude that they are not.

Turning first to the applicability of alternative liability, we note at the outset that the trial court's decision was rendered shortly before this court's decision in *Minnich, supra*. The trial court, however, did analyze alternative liability as that theory was explained in the seminal case of *Summers* v. *Tice* (1948), 33 Cal. 2d 80, 199 P. 2d 1. The trial court's analysis of alternative liability was entirely consistent with our later holding in *Minnich*, which adopted 2 Restatement of the Law 2d, Torts (1965) 441-442, Section 433B(3). That section provides as follows:

"Where the conduct of two or more actors is tortious, and it has been proved that harm has been caused to plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm."

The trial court quoted the above section, and then cited Comment *g* to Section 433B(3), at 446, which states that the burden shifts to the defendant only if the plaintiff can demonstrate that all defendants acted tortiously and that the harm resulted from conduct of one of them. The court, citing Comment *f* to Section 433B(3), *supra*, then noted that "defendants are justifiably held liable because they are proven wrongdoers and hence, blameworthy."

The key point in alternative liability, then, is that the plaintiff must still prove that all the defendants acted tortiously. As we stated in *Minnich:*

"It should be emphasized that under this alternative liability theory, plaintiff must still prove: (1) that two or more defendants committed tortious acts, and (2) that plaintiff was injured as a proximate result of the wrongdoing of *one of the defendants*. Only then will the burden shift to the defendants to prove that they were not the cause of plaintiff's injuries. This doctrine does not apply in cases where there is no proof that the conduct of more than one defendant has been tortious." (Emphasis added.) *Id.* at 397, 15 OBR at 512, 473 N.E. 2d at 1200.

In *Minnich, supra,* both defendants had supplied the identical allegedly defective solvent to the plaintiff's employer. There was no question that plaintiff had been injured by one of the defendants. There was, therefore, no question of unfairness in shifting the burden to the defendants to exculpate themselves. In this case, it is clear that Goldman has not been able to show that any of the defendants acted tortiously, because she is unable to show that *any* of the defendants remaining in this case supplied *any* asbestos products to the Sherlock

---

even begin to make asbestos products until 1963, after Goldman left Sherlock. In view of the fact that summary judgment was pro-

per in any event, we will not have to address this argument.

Bakery. Alternative liability does not do away entirely with the burden of showing proximate causation; rather, this theory relaxes only the traditional requirement that the plaintiff demonstrate that a specific defendant (or defendants) caused the injury. But the relaxation is only warranted where plaintiff shows that all defendants acted tortiously. Here, plaintiff has simply failed to do so. There is no evidence that any remaining defendant furnished any asbestos product to the bakery.

In asbestos litigation, it is often uncertain that the culpable party is before the court. There are over one hundred sixty-five companies that have produced or supplied these products. Special Project: An Analysis of the Legal, Social and Political Issues Raised by Asbestos Litigation (1983), 36 Vanderbilt L. Rev. 573, 581, fn. 22. In addition, the largest producer of asbestos products, Johns-Manville, is no longer amenable to suit because of its reorganization. Even if Johns-Manville were amenable to suit, however, the only way to make sure that the guilty defendant was before the court would be to sue all asbestos companies. As Comment h to Section 433B(3) at 446 states:

"The cases thus far decided in which the rule stated in Subsection (3) has been applied all have been cases in which all of the actors involved have been joined as defendants. * * *"

The trial court's final reason for finding alternative liability inappropriate was also based on Comment h, which indicates that the theory is limited to cases where the defendants' conduct creates a substantially similar risk of harm. Asbestos-containing products do not create similar risks of harm because there are several varieties of asbestos fibers, and they are used in various quantities, even in the same class of product. For example, in this case the answers to plaintiff's first set of interrogatories show that the tape made by Johns-Manville was ninety-five percent asbestos by weight, the tapes produced by Raymark varied in asbestos content from between eighty to one hundred percent, and the duct adhesive made by Celotex contained fifteen percent asbestos fiber and eighty-five percent sodium silicate.[6] The trial court concluded therefore that imposition of joint and several liability would inequitably allocate liability.

The majority of courts that have considered the application of alternative liability to asbestos cases have rejected it for the same reasons. See, e.g., Vigiolto v. Johns-Manville Corp. (W.D. Pa. 1986), 643 F. Supp. 1454 (recovery under Summers alternative liability theory required naming as defendants all asbestos manufacturers who possibly could have caused injury in order to prove that at least one asbestos manufacturer caused harm); Nutt v. A.C. & S. Co., Inc. (Del. Super. 1986), 517 A.2d 690; Marshall v. Celotex (E.D. Mich. 1987), 651 F. Supp. 389.

Even the California Supreme Court, which had adopted alternative liability thirty-two years earlier in Summers, supra, rejected alternative liability in the very case that created market-share liability. In Sindell, supra, the court was faced with a class-action suit against manufacturers of the drug DES. This particular drug, when taken to prevent miscarriage,

---

[6] These differences in composition are also important when considering the fungibility of asbestos products, which will be discussed infra in connection with market-share liability theory.

caused cancer in the female children of those women who took DES while pregnant. In rejecting alternative liability the court stated:

"* * * There is an important difference between the situation involved in *Summers* and the present case. There, all the parties who were or could have been responsible for the harm to the plaintiff were joined as defendants. Here, by contrast, there are approximately 200 drug companies which made DES, any of which might have manufactured the injury producing drug.

"Defendants maintain that, while in *Summers* there was a 50 percent chance that one of the two defendants was responsible for the plaintiff's injuries, here since any one of 200 companies which manufactured DES might have made the product that harmed plaintiff, there is no rational basis upon which to infer that any defendant in this action caused plaintiff's injuries, nor even a reasonable possibility that they were responsible.

"These arguments are persuasive if we measure the chance that any one of the defendants supplied the injury-causing drug by the number of possible tortfeasors. In such a context, the possibility that any of the five defendants supplied the DES to plaintiff's mother is so remote that it would be unfair to require each defendant to exonerate itself. There may be a substantial likelihood that none of the five defendants joined in the action made the DES which caused the injury, and that the offending producer not named would escape liability altogether. While we propose, *infra*, an adaptation of the rule in *Summers*, which will substantially overcome these difficulties, defendants appear to be correct that the rule, as previously applied, cannot relieve plaintiff of the burden of proving the identity of the manufacturer which made the drug causing her injuries." *Sindell, supra,* at 602-603, 163 Cal. Rptr. at 138-139, 607 P. 2d at 930-931 (footnotes omitted).

In *Thompson* v. *Johns-Manville Sales Corp.* (C.A. 5, 1983), 714 F. 2d 581, certiorari denied (1984), 465 U.S. 1102, the court rejected both alternative liability and market-share liability in an asbestos case where the plaintiff was unable to identify all of the defendants that had supplied asbestos products to his employer. Those defendants moved for summary judgment on the basis that the plaintiff had not been able to show any connection between his injuries and any products made by the defendants. The *Thompson* court, in discussing alternative liability stated:

"Also to be distinguished are theories of alternative liability such as those of *Summers* v. *Tice*, 33 Cal. 2d 80, 199 P. 2d 1 (1948) (liability imposed on both of two hunters who fired toward plaintiff, burden on each defendant to show he did *not* cause injury), and of group res ipsa loquitur. * * * [Citation omitted.] All of these concern defendants who were proved to have some factual connection to the plaintiff's injury; to apply them to defendants as to which there is no proof of any such connection would beg the question of causation entirely." *Id.* at 582-583.

A few cases, however, have applied alternative liability to asbestos litigation. For example, in *Menne* v. *Celotex Corp.* (D. Kan. 1986), 641 F. Supp. 1429 (predicting Nebraska law), the court ruled that Nebraska would adopt alternative liability. The plaintiff had shown what kind of products he had been exposed to, and also had shown that the defendants had produced and supplied those products to the naval shipyard where he worked. The

court distinguished *Thompson, supra,* on the basis that the *Menne* plaintiff had been able to present evidence that products of each of the defendants were present and used at his job site.

In *Gard* v. *Raymark Industries, Inc.* (1986), 229 Cal. Rptr. 861, the court ruled that a jury instruction based on the burden-shifting theory in *Summers* v. *Tice* was proper. Raymark had argued that alternative liability was inappropriate because not all the defendants were before the court.

This case is also distinguishable from the case before us. In *Gard,* the plaintiff had been able to identify the products and the manufacturers. The defendants who were not before the court had previously settled with the plaintiff, or had declared bankruptcy. The court's holding is therefore narrow:

"* * * [O]ur holding is that, when plaintiff does not have all defendants before the court, because he has settled with those defendants who are not before the court, and the remaining defendants who are not before the court are immune from suit because they are in bankruptcy proceedings, plaintiff should not be precluded from shifting the burden of proof to defendants. The reasons for our holding are that (1) it is impossible to bring some defendants before this court because of the bankruptcy proceedings, so it is unfair to require plaintiff to bring these manufacturers before the court in order to shift the burden of proof; (2) it is sound public policy to not discourage settling the cases with the other defendants; and, (3) the three remaining defendants did contribute to Gard's exposure to the disease producing cloth. "* * *

"In this case all of the actors cannot be joined. Therefore, we hold where certain defendants cannot be joined because some are in bankruptcy proceedings, and because some other defendants have settled with the plaintiff, so long as all the defendants who can be joined are before the court, it is proper to shift the burden of proof to those defendants." *Id.* at 869-870.

Neither of these cases is applicable to the case before us. Goldman is unable to identify any manufacturers who supplied any products to the Sherlock Bakery.[7]

We conclude, then, that Goldman has not met the requirements for the application of alternative liability under *Minnich.* Alternative liability theory in an asbestos litigation case will be rejected where the plaintiff is unable to prove that the injury was caused by the asbestos-containing products of any of the defendants before the court. Goldman's inability to show a nexus between the only asbestos-containing product proven to be at the bakery — the asbestos tape — and any of the remaining defendants is fatal to the application of alternative liability.

Our conclusion that alternative liability does not apply to this case does not foreclose, but instead requires, a discussion of market-share liability. The court of appeals had held that both theories were applicable based on what we conclude to be an erroneous premise that market-share liability is a way to apportion damages after liability is found pursuant to alternative liability theory. While it is true that market-share liability does involve the assessment of damages, it is, fundamentally, a theory for assessing *liability.* The theory was advanced to

---

[7] The only connection that Goldman can make is that Johns-Manville made tape, and that Sussman Asbestos Co. distributed Manville products. There is no evidence, however, that Manville tape was used at Sherlock Bakery.

provide redress where alternative liability was inapplicable.

Market-share theory was developed by the California Supreme Court in *Sindell* v. *Abbott Laboratories, supra.* In that case, the court was faced with a class-action suit brought by the daughters of women who had taken the anti-miscarriage drug, DES. This drug, ingested by pregnant women, had caused cancer in several of their daughters.

The *Sindell* court actually *rejected* all of plaintiffs' theories of recovery, *including* the alternative liability theory of *Summers, supra.* The court, however, recognized the almost insurmountable problems of proof facing the DES plaintiffs, namely, the inability to identify which company or companies produced the DES ingested by their mothers while the plaintiffs were still in their mothers' wombs. The court then fashioned a variation of *Summers* alternative liability, on public policy grounds, to address the problem. The court justified its rule in the following terms:

"In our contemporary complex industrialized society, advances in science and technology create *fungible goods* which may harm consumers and which cannot be traced to any specific producer. The response of the courts can be either to adhere rigidly to prior doctrine, denying recovery to those injured by such products, or to fashion remedies to meet these changing needs. * * *

"The most persuasive reason for finding plaintiff states a cause of action is that advanced in *Summers:* as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury. Here, as in *Summers,* plaintiff is not at fault in failing to provide evidence of causation, and although the absence of such evidence is not attributable to the defendants either, their conduct in marketing a drug the effects of which are delayed for many years played a significant role in creating the unavailability of proof.

"* * *

"Where, as here, *all defendants produced a drug from an identical formula* and the manufacturer of the DES which caused plaintiff's injuries cannot be identified through no fault of plaintiff, a modification of the rule of *Summers* is warranted. As we have seen, an undiluted *Summers* rationale is inappropriate to shift the burden of proof of causation to defendants because if we measure the chance that any particular manufacturer supplied the injury-causing product by the number of producers of DES, there is a possibility that none of the five defendants in this case produced the offending substance and that the responsible manufacturer, not named in the action, will escape liability.

"But we approach the issue of causation from a different perspective: we hold it to be reasonable in the present context to measure the likelihood that any of the defendants supplied the product which allegedly injured plaintiff by the percentage which the DES sold by each of them for the purpose of preventing miscarriage bears to the entire production of the drug sold by all for the purpose. Plaintiff asserts in her briefs that Eli Lilly and Company and five or six other companies produce 90 percent of the DES marketed. If at trial this is established to be the fact, then there is a corresponding likelihood that this comparative handful of producers manufactured the DES which caused plaintiff's injuries, and only a 10 percent likelihood that the offending producer would escape liability.

"If plaintiff joins in the action the manufacturers of a substantial share

of the DES which her mother might have taken, the injustice of shifting the burden of proof to defendants to demonstrate that they could not have made the substance which injured plaintiff is significantly diminished. While 75 to 80 percent of the market is suggested * * *, we hold only that a substantial percentage is required.

"The presence in the action of a substantial share of the appropriate market also provides a ready means to apportion damages among the defendants. Each defendant will be held liable for the proportion of the judgment represented by its share of that market unless it demonstrates that it could not have made the product which caused plaintiff's injuries." (Emphasis added.) *Sindell, supra,* at 610-612, 163 Cal. Rptr. at 144-145, 607 P. 2d at 936-937.

Notwithstanding the policy reasons cited by the *Sindell* court, it is clear that the significant factual differences between the DES cases and asbestos litigation make market-share liability inappropriate to this case. The foremost difficulty is the concept of *fungibility.* Market-share liability is inappropriate as a viable theory of recovery in an asbestos litigation case, especially where it cannot be shown that all the products to which the injured party was exposed are completely fungible. DES was a synthetic estrogen that was produced pursuant to a single formula. Thus, while the drug was marketed by two hundred companies, there was no difference in the drug or its health risks. In contrast, asbestos is not a "product," but rather a generic name for a family of minerals. The United States Department of Health and Human Services— National Institute for Occupational Safety and Health recommended the following definition of asbestos in a 1980 pamphlet entitled Workplace Exposure to Asbestos: "Asbestos is defined to be chrysotile, crocidolite, and fibrous cummingtonite-grunerite including amosite, fibrous tremolite, fibrous actinolite, and fibrous anthophyllite * * * ." *Id.* at 2. As the defendants have pointed out, asbestos is contained in two thousand to three thousand different products. 44 Fed. Reg. 60,062 (Oct. 17, 1979).

The courts that have considered the application of market-share liability to asbestos litigation have uniformly rejected the theory based on the lack of fungibility, as well as the difficulty in defining the market. For example, a federal district court, sitting in California, refused to apply *Sindell* to an asbestos case, even though market-share liability had been recognized in California by *Sindell.* In *In re Related Asbestos Cases* (N.D. Cal. 1982), 543 F. Supp. 1152, the court stated:

"After careful consideration of the issue, it is concluded that the market share liability theory was not intended to be applied in a context such as the one which is before the court. Where asbestos is the product in question, numerous factors would make it exceedingly difficult to ascertain an accurate division of liability along market share lines. For example, unlike DES, which is a fungible commodity, asbestos fibers are of several varieties each used in varying quantities by defendants in their products, and each differing in its harmful effects. Second, defining the relevant product and geographic markets would be an extremely complex task due to the numerous uses to which asbestos is put. * * * A third factor contributing to the difficulty in calculating market shares is the fact that some plaintiffs were exposed to asbestos over a period of many years, during which time some defendants began or discontinued making asbestos products." *Id.* at

1158. See, also, *Hannon* v. *Waterman S.S. Corp.* (E.D. La. 1983), 567 F. Supp. 90; *Vigiolto, supra; Marshall* v. *Celotex Corp., supra.*

While arguably the difficulties of applying market-share liability in this case are not so acute because the "product field" is narrowed to tape, inherent difficulties remain.

As discussed above, the answers to Goldman's first set of interrogatories show a significant difference in the percentage of asbestos used in the kinds of tape produced by the various defendants. In the case of DES, however, there is no difference among the products distributed by the various companies. Crucial to the *Sindell* court's reasoning was this fact: there was no difference between the risks associated with the drug as marketed by one company or another, and as all DES sold presented the same risk of harm, there was no inherent unfairness in holding the companies accountable based on their share of the DES market. This fundamental difference between DES and asbestos — indeed, asbestos tape alone — is enough to undercut the *Sindell* justification for market-share theory in this case.

Another factor militating against the use of the market-share theory is the absence of Johns-Manville, perhaps the largest asbestos supplier in the world. As the court in *Hannon, supra,* stated at 92:

"A fourth practical difficulty with market share theory in this context would be the prominent absence from the calculation of Johns-Manville, which is, according to the manufacturers' brief, the largest asbestos manufacturer in the United States. In *Sindell,* one trigger for the use of market share was the 'presence in the action of a substantial share of the appropriate market.' * * * [Citation omitted.] While 'substantiality' is in the eyes of the beholder, one of its desirable elements would generally be the main actor in the marketplace." (Footnote omitted.)

Goldman contends that exposure to *any* amount of asbestos is dangerous, and that asbestos-containing products are defective as a matter of law. She cites *Flatt* v. *Johns-Manville Sales Corp.* (E.D. Tex. 1980), 488 F. Supp. 836, 841; *Mooney* v. *Fibreboard Corp.* (E.D. Tex. 1980), 485 F. Supp. 242. Both of these cases relied on *Borel* v. *Fibreboard Paper Products Corp.* (C.A. 5, 1973), 493 F. 2d 1076, which held that the jury in that case could have found the defendants liable under Texas law. Goldman's argument is simply wrong. In *Migues* v. *Fibreboard Corp.* (C.A. 5, 1981), 662 F. 2d 1182, the court implicitly overruled *Mooney* and *Flatt* by stating that *Borel* was concerned only with the evidence presented to the jury, and that "[t]he proposition that all juries presented with similar evidence regarding asbestos products would be compelled to find those products unreasonably dangerous was not presented in *Borel* * * *." *Id.* at 1189.

While we are not unmindful of the great difficulties faced by victims of asbestos exposure, the answer is not contained in a market-share theory that was advanced to address a situation with fewer complexities than those surrounding asbestos exposure and the litigation it has spawned.

We can conceive of no problem more in need of a legislative solution. We think the words of the Iowa Supreme Court in *Mulcahy* v. *Eli Lilly & Co.* (Iowa 1986), 386 N.W. 2d 67, are appropriate. Although *Mulcahy* was a DES case wherein the court rejected market-share liability theory, the same reasoning is at least as applicable to asbestos:

"We reject the market share liability theory on a broad policy basis. We acknowledge that a plaintiff in a DES case with an unidentified product manufacturer presents an appealing claim for relief. Endeavoring to provide relief, courts have developed theories which in one way or another provided plaintiffs recovery of loss by a kind of court-constructed insurance plan. The result is that manufacturers are required to pay or contribute to payment for injuries which their product may not have caused.

"This may or may not be a desirable result. We believe, however, that awarding damages to an admitted innocent party by means of a court-constructed device that places liability on manufacturers who were not proved to have caused the injury involves social engineering more appropriately within the legislative domain. * * *

"* * * Plaintiffs request that we make a substantial departure from our fundamental negligence requirement of proving causation, without previous warning or guidelines. The imposition of liability upon a manufacturer for harm that it may not have caused is the very legal legerdemain, at least by our long held traditional standards, that we believe the courts should avoid unless prior warnings remain unheeded. It is an act more closely identified as a function assigned to the legislature under its power to enact laws." *Id.* at 75-76.

In conclusion, we hold that alternative liability is not applicable to the facts of this case. Even if we were to recognize market-share liability as a viable theory of recovery, this is not the case in which to do so. The judgment of the court of appeals is reversed, and the cause is remanded for reinstatement of the summary judgments as to all defendants.

*Judgment reversed.*

HOLMES, WRIGHT and H. BROWN, JJ., concur.

LOCHER, J., concurs in judgment only.

SWEENEY, ACTING C.J., and DOUGLAS, J., dissent.

SWEENEY, J., sitting for MOYER, C.J.

WOLFF, J., of the Second Appellate District, sitting for SWEENEY, J.