JOURNAL ENTRY AND OPINION
{¶ 1} The estate of plaintiff-appellant Nathalie Vince[1] appeals from summary judgments entered against it on asbestos claims it made against defendant-appellees Crane Company, Goodyear Tire Rubber Company, and Owens-Illinois, Inc.[2] The estate argues that it presented a triable issue of fact on the issue of whether Vince's second-hand exposure to asbestos products manufactured by the defendants constituted a substantial factor in her death caused by mesothelioma. We conclude that the court did not err by granting the summary judgments because the estate failed to establish that the appellees made the products which allegedly caused Vince's exposure; the estate failed to identify these products as being the source of her asbestos exposure; and the estate failed to meet its burden of showing that Vince's exposure to these products constituted a substantial factor in her disease. We therefore affirm the summary judgments. *Page 2 
 I {¶ 2} The supreme court set forth the relevant law on the issue of causation in asbestos cases in Horton v. Harwick, 73 Ohio St.3d 679,1995-Ohio-286, paragraphs one, two and three of the syllabus:
 {¶ 3} "1. For each defendant in a multidefendant asbestos case, the plaintiff has the burden of proving exposure to the defendant's product and that the product was a substantial factor in causing the plaintiff's injury.
 {¶ 4} "2. A plaintiff need not prove that he was exposed to a specific product on a regular basis over some extended period of time in close proximity to where the plaintiff actually worked in order to prove that the product was a substantial factor in causing his injury. (Lohrmann v. Pittsburgh Corning Corp. [C.A.4, 1986], 782 F.2d 1156, disapproved.)
 {¶ 5} "3. Summary judgment is proper in an asbestos case in the same circumstances as in any other case, i.e., when, looking at the evidence as a whole, (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence, construed most strongly in favor of the nonmoving party, that reasonable minds could only conclude in favor of the moving party."[3] *Page 3 
 {¶ 6} Horton adopted the definition of "substantial factor" contained in Restatement of the Law 2d, Torts (1965), Section 431, Comment a:
 {¶ 7} "The word `substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead a [reasonable person] to regard it as a cause, using that word in a popular sense, in which there always lurks the idea of responsibility, rather than the so-called `philosophical sense,' which includes every one of the great number of events without which any happening would not have occurred." Id. at 686.
 {¶ 8} Horton determinedly distinguished the substantiality of exposure from the length of exposure. It specifically rejected the analysis set forth in Lohrmann v. Pittsburgh Corning Corp. (C.A.4, 1986),782 F.2d 1156, which required the plaintiff in an asbestos case to prove proximity to a product on a regular basis for an extended *Page 4 
period of time. Citing to medical literature which suggested that even minimal exposure to asbestos could cause mesothelioma, the supreme court rejected as "scientifically dubious" the time and proximity constraints of the Lohrmann test. Horton, 73 Ohio St.3d at 684.
 {¶ 9} Although we will address the claims of each individual defendant separately, we note that both Crane and Goodyear maintain that, as a matter of law, proof of "minimal exposure" to asbestos is insufficient to establish the "substantial factor" standard in Horton. Goodyear suggests that we look to the American Law Institute's tentative draft of the Restatement of the Law 3d, Torts, Section 36, for the proposition that "[w]hen the actor's negligent conduct constitutes only a trivial contribution to a causal set that is a factual cause of harm * * * the harm is not within the scope of the actor's liability." It maintains that this statement sets forth the general principle that an actor's contribution of harm may be sufficiently de minimus that the court can rule, as a matter of law, that the actor is not liable for that harm. Goodyear thus reasons that only a "substantial exposure" to asbestos can be sufficient to constitute a "substantial factor" in the harm caused to a plaintiff.
 {¶ 10} The estate rejects the "substantial exposure" argument, relying entirely on the second paragraph of the syllabus to Horton for the proposition that it need only establish that a particular defendant's product had been used at the plant. It believes that the supreme court rejected any quantitative threshold for proving an *Page 5 
asbestos-related injury, arguing that any discussion of "substantial exposure" is contrary to current medical opinion which holds that the slightest exposure to asbestos can cause mesothelioma. In other words, if current medical opinion cannot define a minimum safe level of exposure, any quantitative measure imposed by the courts would be arbitrary and unfounded.
 {¶ 11} We are bound by decisions of the Ohio Supreme Court.Schlachet v. Cleveland Clinic Found. (1995), 104 Ohio App.3d 160, 168,661 N.E.2d 259. Reading paragraphs one and two of the syllabus toHorton in harmony, we find that the supreme court set forth the proposition that proof of substantial harm caused by a defendant's product need not come only from proof of substantial exposure to that product. Exactly what the form of some other proof might entail remains unclear. Regrettably, the supreme court consciously chose not to establish "a formulaic approach." Id. at 687. This left several justices admittedly confused as to the relevant standard. For example, Justice Douglas, with two other justices concurring, stated, "I confess that I am unsure what I would do, upon remand, if I were the trial judge." Id. at 689. The Chief Justice, in dissent, agreed with Justice Douglas' sentiments by stating his belief that the majority opinion "does not provide the bench and bar with a test that can consistently be applied in asbestos cases." Id. at 688.
 {¶ 12} The justices concurring in paragraph two of the syllabus toHorton were concerned with "fiber drift" — the phenomenon whereby asbestos dust, once released into the air, can travel long distances via air currents. Even without *Page 6 
"proximity" to the asbestos-containing product, the supreme court recognized that a person could inhale drifting asbestos fibers and be harmed. Nevertheless, the supreme court adhered to longstanding precedent which requires that the actor's negligence be a "substantial factor" in causing the injury. See Pang v. Minch (1990),53 Ohio St.3d 186, paragraph five of the syllabus. Presumably, this statement of law repudiates any contention that once the evidence places an asbestos-containing product anywhere in a facility, a plaintiff is entitled to have the question of causation submitted to the jury because it is likely, given that fibers can drift, that a given plaintiff was exposed to fibers originating in a particular defendant's product.[4]
 {¶ 13} We therefore agree that Horton does not require proof of "substantial exposure." Nevertheless, while the supreme court held that a plaintiff need not prove exposure to a specific product on a regular basis over an extended period of time in close proximity to the product in order to prove that the product was a substantial factor in causing the injury, the mere assertion that the plaintiff had worked in the vicinity of a product containing asbestos cannot be considered a *Page 7 
substantial factor in causing the injury. There must be some evidence to show how the second-hand exposure constituted a substantial factor in causing the injury; that is, that the presence of asbestos had such an effect in producing the harm as to lead reasonable persons to regard it as a cause of the injury.
 {¶ 14} We reach this conclusion by referencing the supreme court's rejection of alternative liability as a theory of recovery in asbestos cases when the defendants' products do not cause a substantially similar risk of harm. See Horton, 73 Ohio St.3d at paragraph four of the syllabus. The supreme court in Horton noted that it adopted the theory of alternative liability in Minnich v. Ashland Oil Co. (1984),15 Ohio St.3d 396, where the syllabus states:
 {¶ 15} "Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm. (2 Restatement of the Law 2d, Torts, Section 433[B][3], adopted.)"
 {¶ 16} The supreme court then cited to Goldman v. Johns-Manville SalesCorp. (1987), 33 Ohio St.3d 40, 46, 514 N.E.2d 691, 697, for the proposition that "[a]sbestos-containing products do not create similar risks of harm because there *Page 8 
are several varieties of asbestos fibers, and they are used in various quantities, even in the same class of product." The supreme court went on to explain that:
 {¶ 17} "In the types of cases traditionally employing alternative liability, the plaintiff is unable even to differentiate between the possible responsible parties. In the within cases, the plaintiffs can at least identify which products they were exposed to most, which contained the highest levels of asbestos, and which were used in a manner more likely to release fibers into the air." Horton, 73 Ohio St.3d at 688.
 {¶ 18} If there is a different risk of harm from separate asbestos products, it is only logical to conclude that an individual product may be a greater or lesser factor in causing the injury than some other product. When a plaintiff is exposed to multiple asbestos-containing products at varying levels, the second paragraph of the syllabus toHorton becomes problematic because it seemingly disregards theGoldman conclusion that necessarily requires that some inquiry into relative exposure be considered.
 {¶ 19} Perhaps the supreme court will clarify its position in the future and provide guidance for the courts. For the time being, the law requires the plaintiff to show that the exposure to a particular product manufactured by a particular defendant was a substantial factor in the plaintiffs injury. In cases where the plaintiff alleges exposure to multiple asbestos-containing products, the burden of showing that one or each of those products was a substantial factor in causing the injury, no matter how minimal the exposure, will be difficult. Yet for us to hold otherwise would *Page 9 
be to sanction the theory of alternative liability that the supreme court clearly rejected.
 II {¶ 20} Nathalie Vince died from mesothelioma. Asbestos exposure is currently considered the sole cause of this rare disease. The estate alleged that from roughly 1955 to 1962, Vince regularly washed the work clothes of an uncle and two aunts who worked at the Wheeling-Pittsburgh Steel Yorkville plant.[5] The estate alleged that these clothes were covered with asbestos dust, and that Vince suffered secondhand asbestos exposure from the dust on those clothes. The estate identified Crane and Goodyear as the manufacturers of asbestos products found in that plant during that time.
 {¶ 21} By the time Vince filed her case, the uncle and two aunts were deceased. Vince testified at deposition before her death, but could give no specifics as to what products her relatives had come into contact with while at the plant. She and her two sons described how the family would gather on Sunday afternoons at an outbuilding on their property to wash clothes. They called this building the "summer kitchen." Vince and her sons related how the relatives' work clothes were often *Page 10 
dusty, and the estate alleges that asbestos from products used at the Yorkville plant made up some of this dust.
 A. Crane Company {¶ 22} It is undisputed that during the period in question, Crane manufactured valves which were used in the Yorkville plant. In answers to the estate's interrogatories, Crane said that the valves were made of metals and did not contain asbestos. Crane admitted that it bought from other manufacturers asbestos-containing packing or discs that were enclosed within the valves. It said that this packing did not emit any "friable or respirable asbestos fibers while enclosed therein." See Answer 5, Responses to Plaintiff's Master Set of Interrogatories to Defendant Crane Company, at 8. Crane stated that any asbestos contained in these components was "chemically and physically bound within the component by a rubber-like compound." Id. Crane did admit that it may have sold a limited amount of replacement packing and discs to its valve customers. Id.
 {¶ 23} Deposition witness Ronald Bogess testified that he worked at the mill from 1972 until the date of his deposition. Despite stating that he worked with Crane packing and that the packing came in a box with the Crane name on it, he could not competently testify to product placement that occurred during the time period in which Nathalie Vince washed her relatives' clothes.
 {¶ 24} Witness Roger McMannis testified by deposition in an unrelated case. At no point in his testimony did he identify any of Vince's relatives as working at the *Page 11 
plant. He identified the Crane name as being one of the manufacturers of pumps and valves used at the mill. He said that these pumps and valves were not manufactured with asbestos. McMannis also identified Crane as one of four manufacturers of asbestos gasket material and pipe coverings. Without identifying a specific manufacturer of the packing, he said that it came in rope form, and was marked "contains asbestos." He said that asbestos-containing packing was "whitish" in color, while non-asbestos-containing material was a "real dark gray." From the1960s to 1972, at which time he became a supervisor and actually ordered the gaskets, he could not be sure who actually supplied the particular gasket or packing used in the pump or valve. He said that "Argo made a lot of it. Crane made some of it." He identified Crane as a manufacturer because the packaging of the valve said "Crane Valve Packing." He conceded that even though the "Crane" name appeared on a pump, someone other than Crane might have supplied the packing that went into the pump. He recalled that the purchasing department would sometimes buy a different brand of packing from that supplied in the original valve because of cost. McMannis also conceded that he could not specifically say that Crane manufactured the actual gasket material used in the pumps or valves.
 {¶ 25} Witness Robert Bryne testified that he worked at the mill during the time frame in question. He said that Crane valves were used in the mill, and that he and other workers occasionally had to replace either the gaskets or packing. He conceded, however, that he could not say exactly when he first noticed Crane valves *Page 12 
being used, guessing possibly in the 1970s, and "[definitely in the `80s and `90s." Moreover, he conceded that, by the time gaskets were replaced, wear on the gasket made it impossible to tell the original manufacturer of the gasket.
 {¶ 26} Neither McMannis nor Bryne offered evidence that would lead a reasonable trier of fact to conclude that the estate met its burden of proving Nathalie Vince's second-hand exposure to Crane's product, through her relatives. Although Bryne worked at the mill during the same time as Vince's relatives, he could not testify that he saw Crane products being used at the mill during the time when Vince would have been doing her relatives' laundry. This failure renders his deposition testimony irrelevant.
 {¶ 27} McMannis did see Crane products being used during the relevant time period, but he did not state that he actually saw any of Vince's relatives working near a Crane product. Moreover, McMannis expressed uncertainty as to which manufacturer's gasket or packing might have been used in a particular valve. At best, his deposition testimony places Crane products in the plant at a time when Vince's relatives worked there. His testimony also established that asbestos products from a number of other manufacturers were also present in the plant.
 {¶ 28} Viewing this testimony in a light most favorable to the estate, we find that the estate has shown only that Crane's asbestos-containing products were in use along with other products containing asbestos. The estate offers no evidence to show what exposure, if any, Vince's relatives may have had from these products. *Page 13 
We find this showing is insufficient, as a matter of law, to meet the estate's burden in opposing summary judgment. No reasonable trier of fact could find on this evidence that Crane's products were a substantial factor in causing Vince's disease.
 B. Goodyear {¶ 29} According to answers given in response to the estate's interrogatories, Goodyear manufactured asbestos gasket material from 1914 through 1969. It manufactured asbestos-covered hoses between 1959 and 1976. It also manufactured gaskets and hoses that did not contain asbestos. A Goodyear employee who worked in the Industrial Products Division for Goodyear from 1952 to approximately 1983 submitted an affidavit in which he attested to his familiarity with Goodyear's design and chemical formulations. He averred that "[t]he great majority of products we made in Industrial Products during the time I was there did not contain asbestos." The affiant stated that Goodyear sold "a number of non-asbestos sheet gasket products.
 {¶ 30} The estate offered the deposition testimony of Anna Gularek, John Orban, Tom Strauss and Charles Glatzer for the sole purpose of placing Vince's aunt and uncle, Hazel Dolfi and Donald Vince, at the Yorkville plant during the relevant time period. Viewing this evidence in a light most favorable to the estate, we conclude for purposes of summary judgment that the estate established that Nathalie Vince's relatives worked at the plant during the relevant time period. None *Page 14 
of these witnesses, however, identified any Goodyear products at the plant during the relevant time period or identified any relative's exposure to such products.
 {¶ 31} The estate also offered the testimony of three product identification witnesses: Ronald Boggess, Frank Pempek and Roger McMannis. As previously noted, Boggess did not begin working at the Yorkville plant until 1976, so he could not competently testify to events occurring between 1956 and early 1960s. During the time Boggess worked at the plant, he could recall working with only one Goodyear product that might have contained asbestos — "a tire that they put around the mortar to roll in the tanks." When asked if he could state what made him believe that the tire had been made of asbestos, Boggess replied, "No, I can't." When asked if it was fair to say that he could not be certain that the product contained asbestos, Boggess replied, "[r]ight. Yes."
 {¶ 32} McMannis worked at the plant during the relevant time period. He testified that he saw "a lot of Goodyear hoses. When asked if those hoses contained asbestos, he said "I am not 100 percent sure, no. I don't know." When pressed to recall specifically if all the hoses contained asbestos, McMannis said, "No. Some of them were rubber. Some of them were asbestos. It was depending on the application." He could not remember if any of the Goodyear hoses had the word "asbestos" written on them, but he did recall seeing boxes of Goodyear hoses that said the product contained asbestos. He described these hoses as being made *Page 15 
of a "woven material," dark-gray in color. He said his only reason for thinking these hoses contained asbestos was because they were used to carry hot liquids. When workers replaced these hoses, they would cut a new hose to length. During that process, he said that some "particles" became airborne.
 {¶ 33} Pempek worked at the plant during the relevant time period and identified "B.F. Goodyear" as the manufacturer of certain hoses that were connected to a hydraulic line. When the hoses were changed, Pempek helped a millwright remove the couplings from those hoses. He identified a two-inch, stainless steel hose with a "white covering" on it. He said that the millwright told him that the "white stuff was an asbestos covering. Pempek saw the word "Goodyear" printed on the hoses, but he did not see the word "asbestos" printed on the hoses.
 {¶ 34} Viewing this evidence in a light most favorable to the estate, we conclude that the estate placed Goodyear products at the plant during the relevant time period. There is some question as to whether those products contained asbestos, but the estate is entitled to the inference that the Goodyear products did contain asbestos. See Civ.R. 56(C).
 {¶ 35} Nevertheless, we find as a matter of law that the estate did not carry its burden of showing that Goodyear's products were a substantial factor in Vince's mesothelioma. The estate offered no evidence to show that either Pempek or McMannis saw Vince's relatives working in the vicinity of the asbestos products. Given the significant number of asbestos-containing products used at the plant, *Page 16 
Goodyear's products may have been but one of any number of products that released asbestos into the air.
 {¶ 36} In a case where second-hand exposure to asbestos is alleged, there must be some showing of causative effect apart from proof that a witness could place a product in a facility at the same time as a relative of the injured party. This is not a question of proximity in time or place, but a simple showing that the product was a substantial factor in causing the injury. The record is replete with evidence to show that Nathalie Vince worked in the same plant as her relatives, so her exposure could have come first-hand from a number of sources. The estate's evidence also showed that Vince's husband might have been exposed to asbestos in his job at an electric company. Clearly, one or both of these scenarios present a potentially significant source of asbestos exposure. Under these circumstances, we find that no reasonable trier of fact would discount Vince's extensive first-hand history of asbestos exposure and find that her very tenuous, second-hand exposure to Goodyear products constituted a substantial factor in causing her mesothelioma.
 III {¶ 37} The estate has failed to offer evidence that Nathalie Vince's relatives were exposed to asbestos manufactured or distributed by either Crane or Goodyear, and that any exposure to these products was a substantial factor in causing her illness and subsequent death. We find that reasonble minds could only conclude that these exposures were too vague and uncertain, in comparison to other *Page 17 
established exposures, to be a substantial factor in causing her injury. There being no genuine issue of material fact on causation, the court did not err by granting summary judgment.
 {¶ 38} The assigned errors are overruled.
Judgment affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MARY EILEEN KILBANE, P.J., and ANN DYKE, J., CONCUR
[1] Vince filed this action in July 2004, and died in December 2004. The record does not contain a suggestion of death as required by Civ.R. 25(E), nor does the record indicate that Vince's estate had been substituted as a party under Civ.R. 25(A). In Perry v. Eagle-PicherIndustries., Inc. (1990), 52 Ohio St.3d 168, the supreme court stated in paragraph three of the syllabus, "[a] dismissal for failure to substitute a decedent's personal representative pursuant to Civ. R. 25(A)(1) is a dismissal without prejudice for lack of personal jurisdiction." Personal jurisdiction can be waived. See Civ.R. 12(H);Holm v. Smilowitz (1992), 83 Ohio App.3d 757, 780. None of the defendants sought to have the action dismissed because of this omission, so they have waived any issue relating to substitution.
[2] Owens-Illinois, Inc. filed an appellee's brief, but did not appear for oral argument. At oral argument, the parties agreed that Owens-Illinois had settled with the estate. We have not received any notice of dismissal to this effect as required by App.R. 28, nor does the trial court docket reflect any settlement. We accept the estate's representation of settlement as a concession on that point and sua sponte order Owens-Illinois, Inc. dismissed from this appeal.
[3] The General Assembly effectively overruled paragraph two of the syllabus to Horton with the adoption of R.C. 2307.96(B), effective to cases filed on or after September 2, 2004. That section sets forth the plaintiff's burden of establishing how a particular defendant's conduct constitutes a substantial factor in any injury or loss:
"(B) A plaintiff in a tort action who alleges any injury or loss to person resulting from exposure to asbestos has the burden of proving that the plaintiff was exposed to asbestos that was manufactured, supplied, installed, or used by the defendant in the action and that the plaintiff's exposure to the defendant's asbestos was a substantial factor in causing the plaintiff's injury or loss. In determining whether exposure to a particular defendant's asbestos was a substantial factor in causing the plaintiff's injury or loss, the trier of fact in the action shall consider, without limitation, all of the following:
"(1) The manner in which the plaintiff was exposed to the defendant's asbestos;
"(2) The proximity of the defendant's asbestos to the plaintiff when the exposure to the defendant's asbestos occurred;
"(3) The frequency and length of the plaintiff's exposure to the defendant's asbestos;
"(4) Any factors that mitigated or enhanced the plaintiff's exposure to asbestos.
[4] We take issue with the estate's citation to Gates v. Owens-CorningFiberglas Corp. (Dec. 3, 1997), Hamilton App. No. C-960369, for the proposition that "Ohio courts have recognized that the opinion of a plaintiff's expert that `every exposure to asbestos dust contributed to [mesothelioma] is sufficient for a jury to find a particular asbestos defendant liable to an asbestos plaintiff." See Appellant's Reply Brief at 7-8. The First District made this statement while recounting the facts adduced at trial as part of a claim that a jury verdict had been against the manifest weight of the evidence. The court did not adopt the expert's findings as a matter of law or accepted scientific fact. For the estate to claim otherwise is to misrepresent this authority.
[5] Vince herself had been employed at Wheeling-Pittsburgh Steel facilities from 1977-1994. The issues raised in this appeal are limited to the "laundry" claims which predate her employment at Wheeling Pittsburgh. *Page 1