**SHELL OIL COMPANY**

v.

**The UNITED STATES.**

No. 340–76.

United States Court of Claims.

Sept. 19, 1979.

John S. Nolan, Washington, D. C., Atty. of Record, for plaintiff; D. R. Milton, F. R. Becker, Leonard J. Sullivan, Houston, Tex., F. Brook Voght, Miller & Chevalier, Washington, D. C., of counsel.

Maxine C. Champion, with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Jr., and Robert S. Watkins, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and BENNETT, Judge.

## OPINION

FRIEDMAN, Chief Judge:

This case, before the court on stipulated facts, presents a novel question concerning the application of the excise tax on air transportation to helicopter service. It arises out of contractual arrangements by which the charge for helicopter service comprises both an hourly rate for actual use of the helicopter and a monthly charge which guarantees the user the availability of a helicopter upon demand. The issue is whether the tax is imposed upon both elements of the total charge (as the Commissioner of Internal Revenue applied it) or only upon the portion of the charge covering the use of the helicopter (as the plaintiff contends). We conclude that the tax covers both elements of the charge, and therefore hold for the defendant.

### I.

The plaintiff (sometimes referred to as "Shell"), a large integrated oil company, has oil rigs and production facilities in the Gulf of Mexico off the Texas and Louisiana coasts. Shell is required to use air transportation to transport employees, materials and supplies to those facilities. It obtains this transportation from so-called air taxis, which are independent contractors.

During the period involved in this case—July 1, 1970 through December 31, 1974—"practically all" of this air transportation involved was furnished under monthly service contracts with two air taxi companies. In return for (1) a fixed monthly rate and (2) a fixed rate for each flight hour, the air taxi agreed to provide Shell, during the month and for 24 hours a day and upon demand, with a particular type of (but not a specific) aircraft. In addition, Shell obtained some helicopter service under daily contracts with a similar type of charge. Shell also sometimes obtained helicopter service on an hourly basis (known as "specials"), the charge for which was substantially higher than the hourly rate under the monthly arrangement. For example, under one of the contracts here involved, the monthly rate was 12,000 plus 150 per flight-hour, and the hourly rate alone was $325. Under the hourly arrangement, unlike the monthly arrangement, service was not

guaranteed and was provided only if a helicopter were available.

The helicopter flights to Shell's coastal facilities generally originated from three terminals that Shell owns and operates. Schedules and passenger lists for the next day's flights, both outgoing and incoming, were prepared daily at each terminal by a Shell employee called a transportation specialist. The scheduled flights began near daybreak, and the helicopters flew to the various rigs that Shell had specified. "Generally, the helicopters had only short layovers of approximately five to ten minutes at each installation to discharge or take-on passengers and cargo."

> After flying the scheduled assignments each morning, the helicopters returned to their home terminal at Morgan City or Venice for the remainder of the day to await further flying assignments. During such period, the aircraft were continuously on call to perform any unscheduled flights assigned to them by the Transportation Specialist. Unscheduled flight assignments could occur at any time during each twenty-four hour day, whenever the need arose.

Because night flights were more expensive and more hazardous than day flights, they were made less frequently.

The helicopters used to serve Shell's coastal facilities under daily or monthly arrangements "averaged approximately four to five hours of flying time per day." The "continuous availability of air transportation" which Shell obtained under the daily and monthly contracts "is essential to Shell's offshore operations."

During this same period, Shell also obtained seaplane service from another air taxi to serve an inaccessible marshy area. Those services "were generally provided to Shell on a monthly basis" under contracts which also provided for "a flat thirty-day fixed charge plus an additional charge for each flight hour."

## II.

Section 4261(a) of the Internal Revenue Code of 1954 imposes a tax of 8 percent "upon the amount paid for taxable transportation (as defined in section 4262)." Section 4262(a)(1) defines "taxable transportation" to mean "transportation by air" beginning or ending in the United States. Section 4262(d) states that "the term 'transportation' includes layover or waiting time and movement of the aircraft in deadhead service."

Shell contends that under these provisions the tax applies only to the amounts paid for the "idle time of an aircraft incurred during a flight assignment for Shell" and that amounts attributable to what it calls "available time"—*i. e.*, time when the aircraft is available to Shell on demand but is not operating on a flight—are not "attributable to 'layover or waiting time' and, thus, are not subject to the 8 percent tax." On Shell's interpretation of the statute, the tax would be payable upon (1) the hourly flight charge plus (2) the portion of the monthly charge that covers the time the helicopter was operating.

Under this analysis and the charges described above, if a helicopter operated for 4 hours on a particular day, the tax would be imposed upon the $600 representing the hourly charge plus upon one-sixth of the $400 daily component of the monthly $12,-000 charge, or $66.67. This would produce a total tax of $53.33. Under the government's theory the tax would be imposed upon the $600 hourly charge and upon the total daily portion of the monthly charge, or $400, for a total tax of $80.

Although the question is close—as Shell itself candidly admits—we conclude that the language of the Code and the history of the provisions in the light of prior revenue rulings indicate that the government's interpretation is correct.

## III.

A. The tax is imposed upon "the amount paid for" "transportation by air." The amount Shell paid for air transportation was not limited to a portion of the total charge attributable to the time the helicopters actually were operating, but also in-

cluded the remainder of the charge. The transportation service that Shell purchased—and the air taxis provided—was not just the actual transportation itself but also included a guarantee that the service would be available whenever Shell needed it. This was a broader service than the mere right to use transportation that was otherwise available.

The nature of the service that Shell obtained is shown by the statement of a Shell official that "[t]he continuous availability of air transportation is essential to Shell's offshore operations" and the stipulated fact that "[m]onthly service arrangements with air taxis are a means of insuring that an aircraft will be available immediately to Shell as, if, and when needed." The "transportation by air" for which Shell paid—and upon which the tax is imposed—was the entire package that the air taxi provided under the monthly rate: service to Shell upon the latter's demand at any time during the day or night.

The economic basis for the monthly charge confirms that the total amount Shell paid under the monthly arrangement was for air transportation. The vice president and general manager of one of the air taxis that served Shell explained the basis of the monthly arrangements and the hourly rates as follows:

(K) The monthly rate structure offered by PHI, utilizing a fixed charge plus an hourly flight charge, has two purposes. The fixed monthly rates are designed to enable PHI to cover its fixed costs for maintaining a helicopter, such costs including insurance, pilots' salaries, depreciation and other overhead costs. The hourly charges for actual flight time are designed to cover variable costs incurred during the flight of the aircraft. Variable costs, for example, include fuel, repair costs, spare parts and supplies.

(L) By contrast, PHI's hourly rate structure charged for the so-called "specials" is established at a figure sufficiently high to recover both fixed and variable costs. This is one reason that the hourly rate for specials is higher than the hourly charge under monthly arrangements.

The portion of the total monthly charge that is applicable to the time the helicopters actually are operating does not cover the full cost of those operations. Both the monthly charge and the hourly rate in combination cover that cost. The rate structure of the air taxis is unlike that of commercial passenger aviation, where there is a single fare that covers both fixed and variable costs. The tax upon commercial passenger fares thus covers both types of costs, as it also does with respect to the much higher rate that air taxis charge on an hourly basis where the service is not guaranteed. In the case of the monthly arrangements that Shell utilizes, the tax properly is laid upon the total amount Shell pays for the transportation service thereby obtained.

B. The Code defines the "transportation by air" upon which the tax is imposed to include "waiting time." Neither the Code nor the Commissioner's regulations define "waiting time." The words, however, in terms cover the time when the helicopters are on the ground, usually at Shell's terminals, so as to be available if and when Shell requires service.

During that time the helicopters are kept "waiting" to be ready to meet any demand Shell may make for their service. Sometimes they may sit for many hours or, in bad weather, even for several days. On other occasions they may "wait" for only the period between the termination of one trip and the beginning of another. But whatever the duration or the reason for their being on the ground, during that time they are "waiting" for Shell to call upon them for service. Although the literal meaning of the word "waiting" is not dispositive, it is not only fully consistent with, but indeed supports, the government's interpretation of the statute.

C. The plaintiff argues, however, that the structure of section 4262(d) requires the contrary conclusion. It states that the words "layover" and "waiting" both modify "time" and that "layover" and "waiting" time are the same concept, that "layover" time by definition relates to a particular

flight of a particular aircraft, and that "waiting" time should be subject to the same limitation. It further points out that the third category that section 4262(d) treats as "transportation"—deadhead service—also relates to a particular flight. It urges that this statutory structure indicates that Congress intended to subject to tax only the charges for actual flight operations.

■ These are substantial arguments, but they do not outweigh the considerations upon which we have relied in reaching the contrary conclusion. Particularly, as shown, the total amount Shell paid for helicopter service, including the portion attributable to the time when the aircraft were not flying, was part of the charge for the transportation service Shell sought and received. Neither the language, statutory structure, nor legislative history (discussed *infra* pp. 928–929) demonstrates that Congress intended to give "waiting time" the narrow meaning the plaintiff ascribes to it or to exclude from it what plaintiff describes as "available" time.

### IV.

A. The modern genesis of the air transportation tax was section 3469 of the Internal Revenue Code of 1939, which was added to the 1939 Code in 1941 as a wartime measure (55 Stat. 721). It provided for a 5 percent tax "upon the amount paid . . . for the transportation . . . of persons by rail, motor vehicle, water, or air." The tax was increased to 10 percent in 1942 (56 Stat. 977), but the operative language quoted above was not changed. The tax was continued after the war and became section 4261 of the 1954 Code. The Tax Rate Extension Act of 1962 (Pub.L.No.87–508, 76 Stat. 114) repealed the tax except for air transportation and reduced the tax from 10 percent to 5 percent. In the Airport and Airway Revenue Act of 1970, Pub.L.No.91–258, 84 Stat. 219, 236, the tax on air transportation was increased to 8 percent.

In 1956 the Commissioner promulgated regulations under section 4261 of the 1954 Code. With respect to charter services the regulation (Treas.Reg. § 49.4261–8(f)(5) ) provided that "where the charge is separable from the payment for the transportation of a person" and the exact amount is shown, the tax

does not apply to the following and similar charges:

\* \* \* \* \* \*

(5) Charges in connection with the charter of a land, water, or air conveyance for the transportation of persons . . . or an air conveyance for transportation of persons . . . such as for parking, icing, sanitation, "layover" or "waiting time," movement of equipment in deadhead service, dockage, wharfage, etc.

In Rev.Rul. 61–140, 1961–2 Cum.Bull. 198, the Commissioner considered the application of the tax "to payments made to a helicopter rental company" under circumstances substantially the same as those in the present case. The Commissioner described the arrangement as follows:

A helicopter rental company furnishes helicopters with pilots to an oil exploration company for the transportation of employees to and from oil well sites. The contract stipulates a per diem charge over the duration of the contract period plus an additional fixed hourly charge for actual flying time. \* \* \* The company bills its customer monthly for two amounts, one for the fixed per diem charge and the other for the actual time in flight.

The Commissioner ruled that where

the helicopter is flown with passengers for only a portion of the time covered by the per diem charge, a transportation service is being furnished during that portion of the time only. Therefore, only that portion of the total payment allocable to transporting passengers constitutes an amount paid for taxable transportation.

Accordingly, in the instant case, it is held that the tax on the transportation of persons applies to that portion of the per diem charge and the fixed hourly charge

which is allocable to the flying of passengers, provided such allocation is made on a fair and reasonable basis and can be supported by proper records. If no allocation is made, the tax applies to the total payment made to the helicopter company. * * *

Shortly thereafter the Commissioner made the same ruling with respect to the application of the tax to a boat that transported oil company employees to and from offshore oil well sites for a daily charge that covered both actual transportation and "waiting" time. He held that "charges for 'stand-by' or 'waiting time' are considered to be charges for nontransportation services within the meaning of the regulation." Rev.Rul. 61–172, 1961–2 Cum.Bull. 200. He cited Rev.Rul. 61–140 as holding that "the tax applies only to that portion of the charges for a helicopter transportation service which is allocable to the time spent in flying passengers."

Section 4262(d) was added to the Code in 1970 by the Airport and Airway Revenue Act of 1970. Prior to that time, the portion of Shell's monthly payments that covered the time the helicopters were not operating would not have been subject to the tax. This was because those payments would have been deemed to be for nontransportation services.

Section 4262(d), however, changed that concept. It provided that "waiting time," among other times, was part of "transportation by air," the amount paid for which is subject to the tax under section 4261(a). The legislative history of the 1970 Act sheds little, if any, light on what Congress intended "waiting time" to cover. One thing is clear, however. In section 4262(d) Congress intended to revise the part of Regulation § 49.4261–8(f)(5) that made the transportation tax inapplicable to "charges in connection with the charter of [an] . . . air conveyance . . . for . . . 'layover' or 'waiting time,' movement of equipment in deadhead service."

The language in section 4262(d) subjecting those activities to the tax obviously was taken from the regulation. Moreover, it is reasonable to assume that Congress also intended to overrule the holding in Rev. Rule. 61–140 that "only that portion of the total payment allocable to transporting passengers constitutes an amount paid for taxable transportation." That latter ruling rested upon the theory that the portions of the total charge applicable to nonflying operations were not for transportation services, and Congress reversed that view when it provided that those theretofore nontransportation services would henceforth be viewed as transportation services and therefore subject to tax.

In 1976 in Rev.Rul. 76–556, 1976–2 Cum. Bull. 354, the Commissioner superseded Rev.Rul. 61–140 and "restated" his position in light of the 1970 Act. He ruled that "[s]ince the helicopter rental company retains possession, command and control over the aircraft at all times, it is selling a transportation service" and "[t]herefore . . . amounts paid for the hourly, per diem and thirty day charges . . . are subject to the tax imposed by section 4261 of the Code." This interpretation by the Commissioner of the Code is entitled to some weight. *United States v. Stowe-Woodward, Inc.*, 306 F.2d 678 (1st Cir. 1962), *cert. denied*, 371 U.S. 949, 83 S.Ct. 503, 9 L.Ed.2d 498 (1963); *Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652, 657 (5th Cir. 1968); *United States v. Hall*, 398 F.2d 383, 387 (8th Cir. 1968).

B. Plaintiff argues that subjecting all of its payments for helicopter service to the tax would be inconsistent with the congressional purpose in the 1970 Act of placing the burden of paying the tax upon the users of public airports and airways, namely, commercial airline passengers. It asserts that the helicopters that serve it use neither of these facilities and therefore that the congressional purpose dictates against applying the tax.

The argument proves too much. For if Congress intended that only the users of airports and airways are to pay the tax, and if plaintiff's helicopters do not use those facilities, then it would follow that no portion of the charges Shell pays for helicopter

service should be taxable. But plaintiff concedes that a portion of those charges are taxable: the hourly charge and the part of the monthly charge that reflects flying time. Plaintiff also contends more narrowly that the charges for the time when the helicopters are available but not flying should not be taxed because during that time the helicopters are not using airports or airways. This reasoning also would indicate that the layover time the helicopters spend on the coastal facilities is not taxable transportation, for during that time the aircraft are not using public airports or airways. Plaintiff, however, admits—as it must do in light of the statute—that the tax covers this time.

■ The short of it is that Congress did not restrict the air transportation tax to direct charges for aircraft flights that utilize public airports or airways.

C. Plaintiff relies upon *White House Sightseeing Corp. v. United States*, 300 F.2d 449, 156 Ct.Cl. 527 (1962). In that case the corporation conducted sightseeing tours by bus. The question was whether the transportation tax (which then covered ground transportation) applied to the time the buses were waiting while the passengers visited the various stops. The corporation contended that this waiting time was nontransportation expense and therefore not taxable. The court rejected the contention. It pointed out (300 F.2d at 451–52, 156 Ct.Cl. at 531)

> The passengers chose plaintiff's bus service and paid its charges as a form of bus transportation from place to place in preference to direct bus transportation, in large part because they had the added privilege of getting off the bus to view points of interest en route, and upon their return the bus and driver were waiting and ready to continue the trip. This added standby waiting cost to plaintiff is certainly an essential part of its cost of transportation. * * *

This reasoning is inconsistent with, rather than supportive of, plaintiff's position. Moreover, *White House Sightseeing Corp.*, was decided prior to the 1970 amendment,

which made "waiting time" a part of taxable transportation.

Plaintiff also relies upon Rev.Rul. 70–515, 1970–2 Cum.Bull. 270. There the Commissioner ruled that the amounts paid for travel cards ($5 and $3) that entitled the holders to reduced fares in certain circumstances were not subject to the tax because "[t]he amounts paid for these travel cards do not entitle the holders to transportation. The cards merely identify the holders as being entitled to purchase transportation at a specified reduction from the fare regularly charged by the airline."

The travel cards merely provided the holders with a reduction in the amount they would pay for transportation when they received it. The charge for the cards, therefore, was not paid for any transportation services. Here, in contrast, as we have shown, the total amount the plaintiff paid for helicopter service, including the total monthly charge, was paid for the transportation service the plaintiff received. Unlike the situation with the travel cards, the total charge here did "entitle" the plaintiff to transportation.

### CONCLUSION

The plaintiff is not entitled to recover any of the excise taxes it paid for helicopter services for the years at issue. The petition is dismissed.