JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff-appellant, Genevieve DiCenzo, appeals from a common pleas court order granting summary judgment in favor of defendants-appellees, Borg-Warner Corporation and George V. Hamilton, Inc. on her claims for injuries sustained by the decedent, Joseph DiCenzo, as well as her claims for wrongful death and loss of consortium as a result of the defendants' negligence, breach of warranty, failure to warn, and defective product design. She contends that she presented evidence establishing that Joseph DiCenzo was exposed to asbestos products manufactured by Borg-Warner, and that this exposure was a substantial factor in causing his mesothelioma. She further contends that Hamilton is subject to strict liability as a supplier in a product liability action, and that genuine issues of material fact precluded judgment on her claim against Hamilton for negligent failure to warn.
 {¶ 2} The record before us consists of an agreed group of filings from the underlying case which the parties have deemed necessary to our review. The limited nature of the record makes a review of the procedural history of the case impractical. We note, however, that the record does include the court's orders granting Borg-Warner's motion for summary judgment, Hamilton's motion for summary judgment as to plaintiff's negligence claims, and Hamilton's motion for judgment on plaintiff's strict liability claim. The record also includes a "final order" *Page 5 
dismissing the case because all claims by or against all parties had been determined.
 {¶ 3} We review the trial court's order granting summary judgment de novo, applying the same standard of review which the trial court applied. As in any case, summary judgment is appropriate in an asbestos case if (a) no genuine issue of material fact remains to be litigated, (b) the moving party is entitled to judgment as a matter of law, and (c) construing the evidence in the light most favorable to the non-moving party, reasonable minds can come to but one conclusion, and that conclusion is adverse to the non-moving party. Horton v. Harwick Chem.Corp., 73 Ohio St.3d 679, 686-87, 1995-Ohio-286.
 Facts {¶ 4} The evidence here showed that plaintiff's decedent, Joseph DiCenzo, was diagnosed with mesothelioma in November 1999 and died on February 22, 2000. Plaintiff submitted expert reports opining that his mesothelioma was caused by his occupational exposure to asbestos.
 {¶ 5} DiCenzo worked at Wheeling Pittsburgh Steel's Yorkville, Ohio plant from 1952 to 1993, except for a leave of absence between 1953 and 1955 for military service. His career was primarily spent in the tin plating department, where he worked in various capacities from laborer to tin line operator. Several of his co-workers provided deposition testimony about asbestos products that were used in the plant, particularly on the tin line. *Page 6 
 {¶ 6} Co-worker Frank Pempek testified that he worked at the Yorkville plant from 1953 to 1988, and specifically recalled working with DiCenzo from 1960. He recalled that DiCenzo's job was performed from a platform under which there were asbestos-covered steam pipes. Portions of both the platform and the steam pipe coverings were replaced every year. He specifically recalled that Johns Manville and Kaylo pipe coverings were used. He recalled seeing boxes of Kaylo insulation from the late 1950's or 1960 until 1980.
 {¶ 7} Co-worker Joseph Tysk testified that he worked with DiCenzo from 1973 until the early 1990's. He testified that they worked daily with an overhead crane, the brake pads for which contained asbestos. He specifically recalled Borg-Warner as a brand of brake pads that was used between 1973 and 1975 and thereafter. He saw Borg-Warner brake pads in the storeroom throughout his career, from 1973 through 1995; the cranes were the only place they could have been used. Although neither Tysk nor DiCenzo actually changed the brake pads, they did work under the cranes while this was being done. Tysk also recalled that DiCenzo worked around pipe insulation.
 {¶ 8} Co-worker Ronald Shane testified that he worked with DiCenzo at the Yorkville plant from 1964 to 1994. He testified that they worked around asbestos insulated pipes and asbestos brake linings, although he did not recall any of the manufacturers of these products. He recalled having seen the name "Borg-Warner" but did not recall what kind of product it was associated with. *Page 7 
 {¶ 9} Co-worker Thomas Strauss testified that he worked with brake linings and pipe coverings at the Yorkville plant that contained asbestos from 1969. He recalled Borg-Warner as one of the manufacturers of the brake linings. However, he later admitted that he did not specifically recall seeing the name "Borg-Warner" on any product in the Yorkville Plant. He did not recall the manufacturer of any of the pipe coverings.
 {¶ 10} Co-worker Roger McMannis worked at the Yorkville plant from 1955 until 1998. He worked near DiCenzo from the 1960's until 1972. He recalled that Kaylo pipe coverings were used in the tin line area. Co-worker Harry Bickerstaff testified that he began working at the Yorkville plant in 1972 and met DiCenzo at approximately a year after he started. He recalled that DiCenzo worked around asbestos pipe covering. He further testified that he unloaded insulation from trucks with the name "Hamilton" on them, although he could not remember the details of the type of insulation. He also testified that there was another pipe insulation supplier; he could not estimate the percentage of insulation that each company supplied.
 {¶ 11} Owens Corning distributed asbestos-containing Kaylo insulation products from 1953 until 1973. Hamilton distributed Kaylo products from 1963. It sold insulation products to Wheeling Pittsburgh Steel, including the Yorkville plant.
 {¶ 12} In its answers to interrogatories, Borg-Warner stated that it manufactured disc brake pads which contained asbestos for vehicle model years *Page 8 
1971 to 1975. It claimed these were sold for automotive use. It also sold clutch assemblies with asbestos-bearing components.
 Law and Analysis {¶ 13} "For each defendant in a multidefendant asbestos case, the plaintiff has the burden of proving exposure to the defendant's product and that the product was a substantial factor in causing the plaintiff's injury. A plaintiff need not prove that he was exposed to a specific product on a regular basis over some extended period of time in close proximity to where the plaintiff actually worked in order to prove that the product was a substantial factor in causing his injury." Horton v.Harwick Chem. Corp., 73 Ohio St.3d 679, 686-87, 1995-Ohio-286.
Summary Judgment for Borg-Warner {¶ 14} In its motion for summary judgment, Borg-Warner argued that plaintiff could present no evidence that Joseph DiCenzo was exposed to its products. Only one of DiCenzo's co-workers, Joseph Tysk, was able to identify Borg-Warner as the manufacturer of brake pads that were used on the overhead cranes in the tin line department. On cross-examination by Borg-Warner's counsel during his deposition, Tysk testified:
 Q: And you mentioned that there were brake pads on the cranes, and you associated those brake pads with the name Borg-Warner. How is it that you would know the names of those brake pads?
 *Page 9 
A: Working in the storeroom in my career, the electric shop was right next to our storeroom, and this is where I became acquainted with some of the material.
 * * * *
 Q: And you have to explain a little further for me, how do you, how does that bring to mind the name Borg-Warner, how do you know that name?
 A: I, I seen that, I seen that in the storeroom, because we disbursed some of this stuff.
 Q: And what was it that you saw in the storeroom related to that name?
 A: I, I actually saw brake pads in the storeroom.
 Q: Okay. When did you work in the storeroom?
 A: That went throughout my career, from 1973 to 1995. *Page 10 
 * * * *
 Q: So you associate the name Borg-Warner with brake pads that you saw in the storeroom. When you disbursed brake pads, do you have a specific recollection of disbursing, yourself, Borg-Warner brake pads?
 A: I can't say that I actually did, but I know the gentleman I was working with when I was first learning the job disbursed this equipment.
 Q: How would you know where those were going and what they were being used on?
 A: Well, they, in my book, they could only go on one place and that would be the cranes.
 Q: Do you know that for certain?
 A: Yes.
 {¶ 15} Several of DiCenzo's co-workers testified that DiCenzo worked below the cranes and would have continued to do his job there even when the cranes were being repaired. There was also testimony from co-worker Thomas Strauss that the brake pads sometimes had to be drilled and cut to fit, and this process created dust.
 {¶ 16} Borg-Warner's answers to interrogatories indicated that the brake pads it manufactured between 1971 and 1975 contained 7% to 28% asbestos fibers, both crocidolite and chrysotile. The expert report of Dr. John Dement opined that asbestos fibers in brakes can break free in the braking process and during the grinding and manipulation process involved in initial installation. Dr. Dement further stated that asbestos fibers that become airborne settle very slowly and can travel great distances on normal air currents, a phenomenon he described as "fiber drift." It is also readily resuspended when disturbed.
 {¶ 17} The evidence presented by plaintiff in opposition to Borg-Warner's motion for summary judgment created a genuine issue of material fact whether *Page 11 
DiCenzo was exposed to asbestos from Borg-Warner's brake products. This evidence is not based on mere assumptions, as Borg-Warner suggests, but on actual testimony from Mr. Tysk that Borg-Warner brake pads were used on the overhead cranes, and from other testimony that dust is released from brakes during the installation process and during their use, that this dust can contain asbestos, that the asbestos can remain airbPlaintiff-appellant, Genevieve DiCenzo, appeals from a common pleas court order granting summary judgment in favor of defendants-appellees, Borg-Warner Corporation and George V. Hamilton, Inc. on her claims for injuries sustained by the decedent, Joseph DiCenzo, as well as her claims for wrongful death and loss of consortium as a result of the defendants' negligence, breach of warranty, failure to warn, and defective product design. She contends that she presented evidence establishing that Joseph DiCenzo was exposed to asbestos products manufactured by Borg-Warner, and that this exposure was a substantial factor in causing his mesothelioma. She further contends that Hamilton is subject to strict liability as a supplier in a product liability action, and that genuine issues of material fact precluded judgment on her claim against Hamilton for negligent failure to warn.
 {¶ 18} The record before us consists of an agreed group of filings from the underlying case which the parties have deemed necessary to our review. The limited nature of the record makes a review of the procedural history of the case impractical. We note, however, that the record does include the court's orders *Page 12 
granting Borg-Warner's motion for summary judgment, Hamilton's motion for summary judgment as to plaintiff's negligence claims, and Hamilton's motion for judgment on plaintiff's strict liability claim. The record also includes a "final order" dismissing the case because all claims by or against all parties had been determined.
 {¶ 19} We review the trial court's order granting summary judgment de novo, applying the same standard of review which the trial court applied. As in any case, summary judgment is appropriate in an asbestos case if (a) no genuine issue of material fact remains to be litigated, (b) the moving party is entitled to judgment as a matter of law, and (c) construing the evidence in the light most favorable to the non-moving party, reasonable minds can come to but one conclusion, and that conclusion is adverse to the non-moving party. Horton v. Harwick Chem.Corp., 73 Ohio St.3d 679, 686-87, 1995-Ohio-286.
 {¶ 20} The evidence here showed that plaintiff's decedent, Joseph DiCenzo, was diagnosed with mesothelioma in November 1999 and died on February 22, 2000. Plaintiff submitted expert reports opining that his mesothelioma was caused by his occupational exposure to asbestos.
 {¶ 21} DiCenzo worked at Wheeling Pittsburgh Steel's Yorkville, Ohio plant from 1952 to 1993, except for a leave of absence between 1953 and 1955 for military service. His career was primarily spent in the tin plating department, where he worked in various capacities from laborer to tin line operator. Several of his co- *Page 13 
workers provided deposition testimony about asbestos products that were used in the plant, particularly on the tin line.
 {¶ 22} Co-worker Frank Pempek testified that he worked at the Yorkville plant from 1953 to 1988, and specifically recalled working with DiCenzo from 1960. He recalled that DiCenzo's job was performed from a platform under which there were asbestos-covered steam pipes. Portions of both the platform and the steam pipe coverings were replaced every year. He specifically recalled that Johns Manville and Kaylo pipe coverings were used. He recalled seeing boxes of Kaylo insulation from the late 1950's or 1960 until 1980.
 {¶ 23} Co-worker Joseph Tysk testified that he worked with DiCenzo from 1973 until the early 1990's. He testified that they worked daily with an overhead crane, the brake pads for which contained asbestos. He specifically recalled Borg-Warner as a brand of brake pads that was used between 1973 and 1975 and thereafter. He saw Borg-Warner brake pads in the storeroom throughout his career, from 1973 through 1995; the cranes were the only place they could have been used. Although neither Tysk nor DiCenzo actually changed the brake pads, they did work under the cranes while this was being done. Tysk also recalled that DiCenzo worked around pipe insulation.
 {¶ 24} Co-worker Ronald Shane testified that he worked with DiCenzo at the Yorkville plant from 1964 to 1994. He testified that they worked around asbestos insulated pipes and asbestos brake linings, although he did not recall any of the *Page 14 
manufacturers of these products. He recalled having seen the name "Borg-Warner" but did not recall what kind of product it was associated with.
 {¶ 25} Co-worker Thomas Strauss testified that he worked with brake linings and pipe coverings at the Yorkville plant that contained asbestos from 1969. He recalled Borg-Warner as one of the manufacturers of the brake linings. However, he later admitted that he did not specifically recall seeing the name "Borg-Warner" on any product in the Yorkville Plant. He did not recall the manufacturer of any of the pipe coverings.
 {¶ 26} Co-worker Roger McMannis worked at the Yorkville plant from 1955 until 1998. He worked near DiCenzo from the 1960's until 1972. He recalled that Kaylo pipe coverings were used in the tin line area. Co-worker Harry Bickerstaff testified that he began working at the Yorkville plant in 1972 and met DiCenzo at approximately a year after he started. He recalled that DiCenzo worked around asbestos pipe covering. He further testified that he unloaded insulation from trucks with the name "Hamilton" on them, although he could not remember the details of the type of insulation. He also testified that there was another pipe insulation supplier; he could not estimate the percentage of insulation that each company supplied.
 {¶ 27} Owens Corning distributed asbestos-containing Kaylo insulation products from 1953 until 1973. Hamilton distributed Kaylo products from 1963. It sold insulation products to Wheeling Pittsburgh Steel, including the Yorkville plant. *Page 15 
 {¶ 28} In its answers to interrogatories, Borg-Warner stated that it manufactured disc brake pads which contained asbestos for vehicle model years 1971 to 1975. It claimed these were sold for automotive use. It also sold clutch assemblies with asbestos-bearing components.
 {¶ 29} "For each defendant in a multidefendant asbestos case, the plaintiff has the burden of proving exposure to the defendant's product and that the product was a substantial factor in causing the plaintiff's injury. A plaintiff need not prove that he was exposed to a specific product on a regular basis over some extended period of time in close proximity to where the plaintiff actually worked in order to prove that the product was a substantial factor in causing his injury." Horton v.Harwick Chem. Corp., 73 Ohio St.3d 679, 686-87, 1995-Ohio-286.
 {¶ 30} In its motion for summary judgment, Borg-Warner argued that plaintiff could present no evidence that Joseph DiCenzo was exposed to its products. Only one of DiCenzo's co-workers, Joseph Tysk, was able to identify Borg-Warner as the manufacturer of brake pads that were used on the overhead cranes in the tin line department. On cross-examination by Borg-Warner's counsel during his deposition, Tysk testified:
 {¶ 31} Several of DiCenzo's co-workers testified that DiCenzo worked below the cranes and would have continued to do his job there even when the cranes were being repaired. There was also testimony from co-worker Thomas Strauss that the brake pads sometimes had to be drilled and cut to fit, and this process created dust. *Page 16 
 {¶ 32} Borg-Warner's answers to interrogatories indicated that the brake pads it manufactured between 1971 and 1975 contained 7% to 28% asbestos fibers, both crocidolite and chrysotile. The expert report of Dr. John Dement opined that asbestos fibers in brakes can break free in the braking process and during the grinding and manipulation process involved in initial installation. Dr. Dement further stated that asbestos fibers that become airborne settle very slowly and can travel great distances on normal air currents, a phenomenon he described as "fiber drift." It is also readily resuspended when disturbed.
 {¶ 33} The evidence presented by plaintiff in opposition to Borg-Warner's motion for summary judgment created a genuine issue of material fact whether DiCenzo was exposed to asbestos from Borg-Warner's brake products. This evidence is not based on mere assumptions, as Borg-Warner suggests, but on actual testimony from Mr. Tysk that Borg-Warner brake pads were used on the overhead cranes, and from other testimony that dust is released from brakes during the installation process and during their use, that this dust can contain asbestos, that the asbestos can remain airborne and can travel a considerable distance, and that Mr. DiCenzo worked directly below the cranes.
 {¶ 34} Borg-Warner argues that there was no evidence that DiCenzo's exposure to its products was a "substantial factor" in causing him harm. Again, we must disagree. DiCenzo worked directly below the cranes. There was evidence from which we may infer that asbestos fibers were released from the cranes' brakes *Page 17 
both during their installation and removal and during their use. These fibers became airborne. Common sense — and the law of gravity — suggests that a worker will easily inhale dust settling down from directly above him or her.
 {¶ 35} Borg-Warner is merely tilting at windmills when it claims that "fiber drift" is insufficient to demonstrate that its products were a substantial factor in causing Mr. DiCenzo's disease. Plaintiffs here are not claiming that Mr. DiCenzo's exposure to Borg-Warner's products occurred only through fiber drift. Rather, there is evidence in the record not only that Borg-Warner's products were in the Yorkville plant, but that they were used directly above the area where Mr. DiCenzo worked. Thus, unlike the plaintiffs in Vince v. Crane Co., Cuyahoga App. No. 87955, 2007-Ohio-1155, plaintiffs here have presented evidence of direct exposure to Borg-Warner's products.
 {¶ 36} While we do not know the frequency with which Borg-Warner brake pads were used as compared to other manufacturers, nor do we know the amount of asbestos that may have been released from the brake pads as compared to other sources which could also have contributed to his disease, it is not necessary for a plaintiff to quantify the proportion of asbestos in the workplace that is attributable to the defendant in order to demonstrate that the defendant's product is a "substantial factor" in causing plaintiff's disease. Indeed, the supreme court specifically stated that "[a] plaintiff need not prove that he was exposed to a specific product on a regular basis over some extended period of time in close proximity to where the *Page 18 
plaintiff actually worked in order to prove that the product was a substantial factor in causing his injury." Horton, 73 Ohio St.3d at 686. In this case, however, the plaintiff did show that the decedent was exposed to Borg-Warner's brakes over an extended period of time and in close proximity to where he worked. Thus, there is a genuine issue whether Borg-Warner's products were a substantial factor in causing his mesothelioma.
 {¶ 37} Genuine issues of material fact precluded judgment for Borg-Warner. Accordingly, we reverse the judgment in favor of Borg-Warner and remand for further proceedings.
Summary Judgment for George V. Hamilton, Inc. {¶ 38} Hamilton filed three separate motions for summary judgment in the proceedings below, first, a motion for summary judgment based on lack of product identification, second, a motion requesting a separate ruling on the issue of strict liability, and third, a motion for summary judgment with respect to plaintiff's claims of negligent failure to warn, breach of warranty, conspiracy, alternative liability and market share liability. Separate rulings on the individual motions indicates that the court granted the second and third motions, but denied the first.
 {¶ 39} In the trial court, plaintiffs did not respond to Hamilton's motion or its oral argument that it could not be subject to strict liability as a supplier because the *Page 19 
Ohio Supreme Court's decision in Temple v. Wean (1977),50 Ohio St.2d 317,[1] did not apply retroactively to suppliers with respect to asbestos-containing products sold prior to the Temple decision. To be sure, plaintiff's response to defendants' motions for summary judgment does argue that sellers of asbestos products may be held strictly liable. However, plaintiff does not address the issue of the retroactive application of Temple. Therefore, appellant failed to preserve this issue for appeal. See, e.g., Shover v. Cordis (1991), 61 Ohio St.3d 213,220; Federated Management Co. v. Coopers Lybrand (2000),137 Ohio App.3d 366, 380-81.
 {¶ 40} Nonetheless, it is well settled that we review trial court decisions on issues of law de novo. See, e.g., Nationwide Mut. Fire Ins.Co. v. Guman Bros. Farm, 73 Ohio St.3d 107, 108, 1995-Ohio-214. It is equally well settled that cases should be decided on their merits.Reichert v. Ingersoll (1985), 18 Ohio St.3d 220, 222. The so-called "retroactive" application of Temple v. Wean to impose liability on a seller for sales occurring before 1977 (when Temple was decided) is a necessary *Page 20 
precondition to plaintiff's strict liability claim,[2] and has never been called into question before,[3] to our knowledge, at least at the appellate level. Consequently, in the interests of fairness we will consider the issue here.
 {¶ 41} In concluding that Temple v. Wean should not be applied retroactively, the trial court applied the test used by the United States Supreme Court in Chevron Oil Co. v. Huson (1971), 404 U.S. 97, for retroactive application of new rules of federal law. TheChevron court applied a tripartite test to determine whether the new rule of law should be applied retroactively:
 First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied * * * or by deciding an issue of first impression whose resolution was not clearly foreshadowed * * *. Second, it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." * * * *Finally, we have weighed the inequity imposed by retroactive application, for "where a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the `injustice or hardship' by a holding of nonretroactivity." * * * * *Page 21 
Chevron, at 106-07.
 {¶ 42} Plaintiff asserts that Chevron was overruled by Harper v.Virginia Dept. Of Taxation (1993), 509 U.S. 86. In Harper, the Supreme Court held that "[w]hen this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."
 {¶ 43} Clearly, if the Harper analysis applies, Temple v. Wean must be applied retroactively to events which predated that decision. While it is not entirely clear that Harper overrules Chevron, however, seeHyde v. Reynoldsville Casket Co., 68 Ohio St.3d 240, 1994-Ohio-67, we conclude that even under Chevron, Temple v. Wean should apply retroactively.
 {¶ 44} We disagree with the trial court's conclusion that Temple v.Wean established a new principle of law. In fact, the Ohio Supreme Court relied upon Restatement of the Law 2d, Torts, § 402A as early as 1966. In Lonzrick v. Republic Steel Corp. (1966), 6 Ohio St.2d 227, 239, the supreme court cited § 402A, among other authorities, to establish a cause of action for breach of implied warranty in the absence of privity of contract. The court in Temple concluded that "there are virtually no distinctions between Ohio's Implied warranty in tort' theory and the Restatement version of strict liability in tort." Temple,50 Ohio St.2d at 322. Thus, the primary effect of Temple was to incorporate the Restatement into Ohio law *Page 22 
expressly, not to create a new cause of action. Cf. McAuliffe v. W.States Import Co., 72 Ohio St.3d 534, 539 (noting that strict product liability causes of action existed before the Ohio Product Liability Act, and citing, e.g., Lonzrick).
 {¶ 45} As the trial court noted in its decision in In re Goldberg 23Trial Group, the primary goal of Temple was to facilitate analysis of strict liability cases by incorporating the Restatement formulation and its numerous illustrative comments. Temple, 50 Ohio St.2d at 322. This goal would certainly be hampered if the Restatement's analysis were not applied in all cases decided after Temple. It would artificially limit the body of law to be considered, forcing unnecessary reinvention to fill in analysis the Restatement could readily supply.
 {¶ 46} Finally, we cannot say that application of Temple to suppliers of asbestos products before 1977 would be inequitable. As noted above, there is virtually no distinction between the implied warranty cause of action recognized by Lonzrick in 1966 and the strict liability theory under the Restatement adopted by Temple. Thus, defendants are not held to any higher standard than they were already required to meet. Therefore, we hold that Temple applies retroactively to suppliers, like Hamilton, who may have supplied asbestos products before theTemple case was decided.
 {¶ 47} In its motion for summary judgment, Hamilton did not argue the merits of plaintiff's strict liability claim against it under the Restatement formulation adopted in Temple. Undoubtedly, many factual and legal issues may yet arise, e.g., as to *Page 23 
whether, Hamilton is a "seller" and whether Mr. DiCenzo is a "user or consumer." See Restatement of the Law 2d, Torts, § 402A, commento.[4] Accordingly, we must reverse and remand for further proceedings on appellant's strict liability claim against Hamilton.
 {¶ 48} Appellant also urges that there is a genuine issue of material fact regarding its claim against Hamilton for negligent failure to warn because she presented evidence that Hamilton knew about the dangers of asbestos as early as 1961, there was no evidence that DiCenzo knew about those dangers, yet Hamilton did not warn DiCenzo or other employees of the hazard. Plaintiffs make the blanket assertion that "Hamilton had the opportunity to warn Mr. DiCenzo and other co-workers of the hazards of asbestos-containing products it supplied through verbal, written, or in person communication." While plaintiffs suggest such measures as warning labels or informational literature, there is no evidence to suggest that such information could have reached DiCenzo, who did not work directly with the *Page 24 
pipecovering Hamilton supplied. "[T]he requirement of an adequate warning extends only to those to whom the distributor has reasonable access." Hargis v. Doe (1981), 3 Ohio App.3d 36, 38. Plaintiffs did not demonstrate that Hamilton had reasonable access to DiCenzo, so there was no evidence that any failure to warn was a proximate cause of DiCenzo's injury. Id.
 {¶ 49} Accordingly, we reverse the judgment in favor of Borg-Warner Corporation and remand for further proceedings. We affirm the judgment in favor of George v. Hamilton, Inc. with respect to plaintiffs claim for negligent failure to warn, but reverse the judgment in favor of George V. Hamilton, Inc. with respect to plaintiff's strict liability claim, and remand for further proceedings on that claim as well.
Affirmed in part; reversed in part.
It is ordered that each party shall bear her or its own costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 25 
SEAN C. GALLAGHER, P.J., and PATRICIA ANN BLACKMON, J., CONCUR
[1] In Temple v. Wean, the Ohio Supreme Court adopted the formulation of a strict liability claim set forth in Restatement of the Law 2d, Torts, § 402A: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. (2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."
[2] Appellants agree with the defendants that "O.R.C. § 2307.78(B) cannot be applied retroactively with regard to asbestos exposure occurring before 1987, the date of enactment of the statute." Appellant curiously argues in the alternative that "should this Court determine that O.R.C. 2307.78(B) may be applied retroactively, that G.V. Hamilton is subject to liability under Ohio's supplier statute." Given appellant's agreement that the statute does not apply retroactively, there is no actual controversy regarding this issue in this case. Therefore, we decline to address this argument. Appellant's only potential theory of strict liability lies with Temple v. Wean.
[3] The trial court previously decided this issue in In re Goldberg 23Trial Group. However, we are not aware of any appeal of that decision.
[4] "Injuries to non-users and non-consumers. Thus far the courts, in applying the rule stated in this Section, have not gone beyond allowing recovery to users and consumers, as those terms are defined in Commentl. Casual bystanders, and others who may come in contact with the product, as in the case of employees of the retailer, or a passer-by injured by an exploding bottle, or a pedestrian hit by an automobile, have been denied recovery. There may be no essential reason why such plaintiffs should not be brought within the scope of the protection afforded, other than that they do not have the same reasons for expecting such protection as the consumer who buys a marketed product; but the social pressure which has been largely responsible for the development of the rule stated has been a consumers' pressure, and there is not the same demand for the protection of casual strangers. The Institute expresses neither approval nor disapproval of expansion of the rule to permit recovery by such persons." *Page 1